UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| INTERNATIONAL OFFICE CENTERS | : | |
| CORPORATION, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3-04-cv-990 (JCH) |
| | : | |
| PROVIDENCE WASHINGTON | : | SEPTEMBER 14, 2005 |
| INSURANCE COMPANY, | : | |
| Defendant. | : | |

**RULING RE: MOTIONS FOR PARTIAL SUMMARY JUDGMENT [DKT. NOS. 10
and 28], MOTION FOR PREJUDGMENT REMEDY [DKT. NO. 13],
and MOTION FOR DISCLOSURE OF ASSETS [DKT. NO. 14]**

International Office Centers Corporation ("IOC") initiated this action on June 17,

2004.  IOC claims that the defendant, Providence Washington Insurance Company

("PW"), has acted in violation of various state laws in its treatment of IOC's claims

under one or more insurance policies held by PW.  IOC seeks a declaratory judgment

regarding the parties' respective rights and obligations pursuant to any relevant policies,

as well as damages for breach of contract, misrepresentation, waiver and estoppel,

common law bad faith, and the Connecticut Unfair Trade Practices Act ("CUTPA").  IOC

seeks partial summary judgment in its favor on portions of its claims for declaratory

judgment, common law bad faith and breach of contract.  PW seeks partial summary

judgment in its favor on the CUTPA claim.

I.      FACTS

IOC provided temporary executive office space in the World Trade Center from

1979, when the World Trade Center first opened, until September 11, 2001.  Its own

office was located on the 79th floor of 1 World Trade Center.  When the World Trade

Center was attacked on September 11, 2001, four IOC employees died and IOC's offices in New York and all of its business records were destroyed.  IOC's clients obtained office accommodations in other locations.

PW is an insurance company organized under the laws of Rhode Island.  Its corporate offices are located in Providence, Rhode Island.  It is licensed in Connecticut to sell insurance.  PW has been IOC's insurer since 1993.  IOC's policy covers both business income losses and building and personal property losses, including coverage for improvements and betterments.

Following the terrorist attacks, IOC's president and sole shareholder, Burdette Russo, met with PW's claims adjuster, Charles Reilly, on September 24, 2001.  Russo provided Reilly with various documentation, including a floor plan, lease, brochures, and general descriptions, to support IOC's claims under its PW policies.  On November 29, 2001, they met again.  Reilly presented Russo with a preliminary estimate of the loss – $272,042 of business income losses and $3.9 million of property losses.  IOC estimated the business income loss at $2.3 million and property losses at $5.6 million.  The parties negotiated loss amounts for over a year.  To date, PW has paid approximately $3.5 million.  IOC estimates that it is entitled to the total limit under both policies, approximately $8,260,000.

## II.    STANDARD OF REVIEW

In a motion for summary judgement, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  The

burden of showing that no genuine factual dispute exists rests upon the moving party. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994)). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.    INTERPRETING THE POLICIES

### A.    Standard

"With respect to a contract claim, a court may construe the contract and grant summary judgment when the contractual language is 'plain and unambiguous.'" Zurich Am. Ins. Co. v. ABM Indus., Inc., 397 F.3d 158, 164 (2d Cir. 2005) (quoting Brass v. Am. Film Techs., Inc., 987 F.2d 142, 148-49 (2d Cir. 1993)). "Where the provisions of the policy "are clear and unambiguous, they must be given their plain and ordinary

meaning, and courts should refrain from rewriting the agreement ."  U.S. Fid. & Guar. Co. v. Annunziata, 67 N.Y.2d 229, 232 (1986)).  "Under New York law, moreover, a 'policy must . . .  be construed in favor of the insured, and ambiguities, if any, are to be resolved in the insured's favor and against the insurer.'"  Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d 384, 390 (2d Cir. 2005) (quoting U.S. Fid. & Guar. Co., 67 N.Y.2d at 232.

### B.    The Business Income Loss Policy

PW insured IOC against business income losses.  The policy provides that PW "will pay for the actual loss of Business Income [IOC sustain[s] due to the necessary suspension of [its] 'operations' during the 'period of restoration'."  Business Income (and Extra Expense) Coverage Form, [Doc. No. 15, Ex. 1] at 1.  The coverage applies only where the suspension of operations is "caused by direct physical loss of or damage to property."  Id.

The parties dispute the length of time of the "period of restoration."  The policy provides that the "period of restoration"

a. Begins: (1) 72 hours after the time of direct physical loss or damage for Business Income coverage; or (2) Immediately after the time of direct physical loss or damage for Extra Expense coverage; caused by or resulting from any Covered Cause of Loss at the described premises; and b. Ends on the earlier of: (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) The date when the business is resumed at a new permanent location.

Business Income (and Extra Expense) Coverage Form, [Doc. No. 15, Ex. 1] at 8.  The parties do not dispute the date on which the period of restoration begins.  They do, however, dispute the date on which that period ends.  The policy provides two

alternatives.  Because the parties do not dispute, as a factual matter, that IOC's

business operations have not resumed, either at their original location or a "new

permanent location," the second alternative simply does not apply.  Therefore, the court

concludes that the applicable end date is "[t]he date when the property at the described

premises should be repaired, rebuilt or replaced with reasonable speed and similar

quality."  Id.  IOC argues that the restoration period ends when its office at the World

Trade Center "should be repaired, rebuilt or replaced."  PW contends that the

restoration period ends when IOC's office "should be repaired, rebuilt or replaced," and

that there is no geographic restriction on where that office exists.  Determining which

understanding of the policy is correct turns on the court's understanding of the term,

"property at the described premises."

Following the terrorist attacks of September 11, 2001, this question has arisen

with respect to similar policies governing loss coverage for businesses formerly located

in the World Trade Center towers.  Considering a business interruption policy held by

Duane Reade, Inc., which operated the most profitable outlet of its more than two

hundred drug stores in the main concourse of the World Trade Center, the Second

Circuit recently concluded that the restoration period described in that policy extended

until such time that the store could be rebuilt at some location, not necessarily the

location of the former World Trade Center.[1]  The circuit court based its conclusion on

the fact that the policy "is a general one covering all 200 Duane Reade stores.  It makes

---

[1]That policy provided that the Restoration Period "shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuilt, repair, or replace such property that has been destroyed or damaged."  Duane Reade, Inc. v. St. Paul Fire & Marine Ins, Co., 411 F.3d at 387.

no reference to the WTC store . . . .  This omission distinguishes this case from those

cases, relied upon by Duane Reade, in which the court tied the length of business

interruption coverage to the rebuilding and/or replacing of the specific property that was

the subject of the insurance policy."  <u>Duane Reade, Inc. v. St. Paul Fire & Marine Ins,

Co.</u>, 411 F.3d at 395.

  Two district court cases have also interpreted the term "period of restoration" as

used in insurance policies covering business losses resulting from the terrorist attacks

on the World Trade Center.  Streamline Capital, L.L.C., a business providing

technological and computer management facilities to securities traders, brokers and

dealers, sued its insurance company over a dispute regarding insurance coverage for

its offices in One World Trade Center.  <u>Streamline Capital, L.L.C. v. Hartford Casualty

Ins. Co.</u>, No. 02 CIV. 8123 (NRB), 2003 WL 22004888 (S.D.N.Y. Aug. 25, 2003).  The

Streamline policy, like the one at issue in this case,  defined the period of restoration as

that period which "[e]nds on the date when the property at the described premises

should be repaired, rebuilt or replaced with reasonable speed and similar quality."  <u>Id</u>. at

*7.  The court concluded that "[c]onstruing the words 'described premises' to mean

plaintiff's suite of offices in One World Trade Center is a far more reasonable

construction than taking those words to mean either One World Trade Center or the

World Trade Center site as a whole."  <u>Id</u>. at *8.  "That the business income coverage

only applies to the suspension of the plaintiff's 'operations' indicates that it is dependent

only on replacing what is necessary to resume those operations – namely, the plaintiff's

personal property, not a specific office at a specific location."  <u>Id</u>.  The <u>Streamline</u> court

concluded that the premises described included only the plaintiff's office suite.[2]  It found

that to interpret the policy otherwise would require the court to adopt the "unreasonable"

premise that "the period of restoration should be tied to the rebuilding of real property

over which neither the insured nor the insurer had any control, instead of tying it to a

process that the plaintiff controlled: the acquisition of replacement office space and the

installation of the plaintiff's personal property in that space."  Id.

Lava Trading Inc., a company that sells computer programs that facilitate the

electronic trading of equities, sued its insurer, Hartford Fire Insurance Company, over a

dispute over the definition of the "period of restoration" provided for in a business

insurance policy.  Lava Trading Co. v. Hartford Fire Ins. Co., 365 F.Supp.2d 434

(S.D.N.Y. 2005).  Prior to September 11, 2001, Lava maintained offices and a data

center at the World Trade Center and a nearly-complete back-up center in another

building in lower Manhattan, 75 Broad Street.  Following September 11, 2001, Lava

converted its back-up center into a fully operational data center and established

temporary office space there as well.  A month after the attacks on the World Trade

Center, Lava resumed operations.  It continued to build out its space at 75 Broad Street

and prepared to build a new data center in Connecticut.  The insurance policy defined

"period of restoration" as ending on "the date when the property at the described

premises should be repaired, rebuilt or replaced with reasonable speed and similar

quality."  Id. at 439.  The court found the reasoning in the Streamline decision, supra, to

_____

[2]  The Declaration stated: "1 World Trade Center Suites 4549, New York, NY."  Id. at *8
fn.7.

be persuasive.[3]  The court concluded that "the 'period of restoration' ends when the property <u>necessary to resume operations</u> should have been repaired, rebuilt or replaced with reasonable speed and similar quality, and not when operations have been actually resumed, whether to their pre-loss levels or otherwise."  <u>Lava Trading Co</u>., 365 F.Supp.2d at 442.

     IOC distinguishes <u>Duane Reade</u> on the basis that its insurance policy, unlike that interpreted by the Second Circuit in <u>Duane Reade</u>, was tied to its former location at One World Trade Center.  The policy interpreted in <u>Duane Reade</u> "is a general one covering all 200 Duane Reade stores.  It makes no reference to the WTC store or, for that matter, <u>any</u> specific property other than Duane Reade's main headquarters. <u>Duane Reade</u>, 411 F.3d at 395.  The Second Circuit found that, "[t]his omission distinguishes this case from those cases, relied upon by Duane Reade, in which the court tied the length of business interruption coverage to the rebuilding and/or replacing of the specific property that was the subject of the insurance policy."  <u>Id</u>.  This court concludes that IOC's policy is more akin to those policies described by the Second Circuit as "specifically referr[ing] to the subject property, which typically was identified by address," <u>id</u>., than it is to the Duane Reade policy because IOC's policy makes specific reference to its location at the World Trade Center, while Duane Reade's policy did not.

     In this regard, the <u>Streamline</u> opinion, cited with approval in <u>Duane Reade</u>, would appear to suggest a contrary conclusion.  In <u>Streamline</u>, as here, the Declarations

---

[3]  As in <u>Streamline</u>, the Declaration defined the "described premises" as Lava's suite of offices on the 83rd floor of the World Trade Center.  365 F. Supp. at 441.

stated a specific location.[4]  See fn. 2, <u>supra</u>.

In <u>Streamline</u>, the district court concluded, "[t]hat the business income coverage only applies to the suspension of the plaintiff's 'operations' indicates that it is dependent only on replacing what is necessary to resume those operations – namely, the plaintiff's personal property, not a specific office at a specific location.  <u>Streamline</u>, 2003 WL 22004888, *9 (quoted in <u>Duane Reade</u>, 411 F.3d at 396).  What distinguishes the instant case from <u>Streamline</u> and <u>Duane Reade</u> is that here the plaintiff's operations <u>are</u> dependent on replacing "a specific office at a specific location."  <u>Id</u>.  Although <u>Streamline</u>'s policy names a location, that location is not the essence of the insured's operation.  Here, the World Trade Center location was at the essence of defendant's business.  Other locations do not have the "cache" or proximity to all the tenants who were in the World Trade Center.  The business of IOC required that.

For the purposes of the business income loss policy, the "described premises" are provided in the Commercial Property Supplemental Declaration. [Doc. No. 15, Ex. 3].  The covered properties are described as "One World Trade Center, New York, NY10048 Office" and "One World Trade Center New York, NY 10048 Improvmnts [sic] & Bettermts [sic]."  As the "described premises" is located at the World Trade Center, the "period of restoration" must end when IOC's office and improvements and betterments "should be repaired, rebuilt or replaced with reasonable speed and similar

---

[4]  The <u>Duane Reade</u> court stated that, as in <u>Duane Reade</u>, the <u>Streamline</u> policy said "nothing about the specific location of the interrupted business."  411 F.3d at 396.  This court respectfully disagrees.

quality."  Business Income (and Extra Expense) Coverage Form, [Doc. No. 15, Ex. 1] at

8.  The "period of restoration" consists of the time until the site described in the

Supplemental Declaration – an office at One World Trade Center – should be rebuilt or

replaced.  The fact that the second possible end date, "[t]he date when the business is

resumed at a new permanent location," makes explicit reference to a "new permanent

location" strongly suggests that the term "the property at the described premises" is

geographically limited to that specific property that described in the Commercial

Property Supplemental Declaration.

         The instant policy also provides that the amount of business income loss is

subject to reduction "to the extent [IOC] can resume [its] 'operations,' in whole or in

part, by using damaged or undamaged property (including merchandise or stock) at the

described premises or elsewhere."  Business Income (and Extra Expense) Coverage

Form, [Doc. No. 15, Ex. 1] at 5.  Should IOC choose not to resume operations or should

it fail to do so "as quickly as possible," PW "will pay based on the length of time it would

have taken to resume 'operations' as quickly as possible."  Id.  Essentially, this

provision requires IOC to mitigate any damages resulting from damage to property. The

parties do not dispute that IOC has not resumed operations.  They dispute, however,

"the length of time it would have taken [IOC] to resume 'operations' as quickly as

possible."  Id.  Resolution of this question turns on the definition of the term

"operations."  Should the term be defined as the leasing of temporary executive office

space, the resumption time period will be much shorter than if the term is defined as the

leasing of temporary executive office space at the World Trade Center.  IOC has served

as the sole provider of temporary executive office space from the date the World Trade

Center first opened until September 11, 2001.  Between 1984 and September 11, 2001,

its only place of business was the World Trade Center.  Its business model depends on

its geographic location.  The court finds that the term "operations" is defined as the

leasing of temporary executive office space at the World Trade Center.

 While Duane Reade may appear at first blush to require a different result than

that reached here, it is important to note that the policy at issue here is not identical to

that considered by the circuit court in Duane Reade.  Furthermore, while the circuit

court, like Judge Buchwald in considering Streamline, hesitated to interpret an

insurance policy to allow the extent of exposure to depend on a non-party's rebuilding,

the parties to an insurance contract are free to contract to that end.  The parties in this

case could have contracted to achieve a different result.  The insurance policy at issue,

however, defines "operations" and "property at the defined premises" such that the

court must conclude that the policy here requires payment for business income losses

for a period of restoration during which IOC has the opportunity to resume its

operations, namely providing temporary office space at the World Trade Center.

### C. The Property Loss Policy

 IOC also seeks a declaratory judgment regarding its building and personal

property loss coverage.  IOC argues that its property loss policy is valued rather than

open.  Therefore, it establishes an agreed value to be paid in the event of a total loss.

 "[T]he interpretation of the policy concerning whether or not it is a valued policy is

a question of law for the court."  Nichols v. Hartford Fire Insur. Co., 403 N.Y.S.2d 335,

336 (3d Dep't 1978).  "A valued policy is one in which the parties have agreed upon the

value of the property insured in the event of future loss."  Naiman v. Niagara Fire Insur.

- 11 -

<u>Co.</u>, 140 N.Y.S.2d 494, 496 (1st Dep't 1955); <u>see</u> <u>also</u> 44 Am. Jur. 2d Insur. § 1500 ("A 'valued policy' is one in which the value of the property insured is agreed upon by the parties so that in the case of total loss, it is not necessary to prove to actual value to recover under the policy.").  "A valued policy is one in which the words 'valued at' appear and the amount at which the property insured is 'valued at' definitely fixes the liability of the insurer and is conclusive on the parties."  <u>Lee v. Hamilton Fire Insur. Co.</u>, 251 N.Y. 230, 234 (1929).  Where the policy "fixes the amount at which the property was insured or valued at as" a particular amount, it is "a technical valued policy."  <u>Id</u>. Under these circumstances, where "the loss was total, then under the valued policy the plaintiff would be entitled to receive the amount of the policy."  <u>Id</u>. at 235.  Where an insurance policy is a valued one, "where the bona fides of the transaction is not assailed and neither fraud, nor mistake, is charged, the valuation is conclusive upon the parties."  <u>Michael v. Prussian Nat'l Insur. Co.</u>, 171 N.Y. 25, 33 (1902).  The Commercial Property Supplemental Declaration includes Optional Coverage for "Your Personal Property."  The "Agreed Value" of such property is $3,380,000 and $2,250,000, totaling $5,630,000.  IOC argues that because it suffered a total loss, it is entitled to coverage in amount of the agreed value of $5,630,000.

PW contends that the Agreed Value provision is relevant only to the issue of coinsurance.  According to the policy, "[t]he Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. [PW] will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations."  Building and Personal Property Coverage Form [Doc. No. 15,

Ex. 2] at 10.  Furthermore, PW contends that the Agreed Value provision cannot override the various other provisions that describe how coverage is to be determined. PW cites no case law to support its reading of the policy.  Its reasoning is clearly contrary to New York law on agreed value policies.  The fact that a valued policy includes an appraisal process or policy with respect to determining value does not render the policy open rather than valued.  Where loss is partial, an appraisal may be appropriate.  Lee, 251 N.Y. at 235.  "[T]he appraisal was to cover only 'loss or damage' less than a total loss."  Id.  Where loss is total, however, the coverage is fixed at the valued amount.  It is the inclusion of the term "valued" and a numerical value that render a policy valued rather than open.

Therefore, the court concludes that the policy is valued at $5,630,000.  Because the loss was total, a fact not disputed by the parties, IOC is entitled to coverage in that amount.

## IV.    COMMON LAW BAD FAITH

IOC claims that PW has acted in bad faith.  Connecticut law recognizes a cause of action for common law bad faith against insurers.  See Buckman v. People Express, Inc., 206 Conn. 166, 170 (1987) (Connecticut "recognizes an independent cause of action in tort arising from an insurer's common law duty of good faith").  PW claims that Connecticut law is not applicable to the instant action and that, as IOC concedes, New York law recognizes no such claim.  PW further contends that even if Connecticut law is applicable, there is no factual basis for IOC's claim that PW has acted in bad faith.

While Connecticut has "traditionally adhered to the doctrine that the substantive rights and obligations arising out of a tort controversy are determined by the law of the

place of injury, or lex loci delicti . . . in certain circumstances in which the traditional doctrine does not apply, the better rule is the analysis contained in the Restatement (Second) of the Conflict of Laws." Williams v. State Farm Mutual Automobile Insur. Co., 229 Conn. 359, 370 (1994); see O'Connor v. O'Connor, 201 Conn. 632 (1986). The Restatement (Second) requires that this court consider which state "has the most significant relationship to the occurrence and the parties."  Such determination will require consideration of factors including "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  The relative importance of these factors is determined with respect to the instant issue.

Prior to September 11, 2001, Connecticut had no relationship to the parties or their relationship with one another.  PW is a Rhode Island corporation licensed to operate in both Connecticut and New York.  IOC is a Delaware corporation whose sole place of business was New York.  The policy was negotiated and issued in New York. Following September 11, 2001 and the destruction of plaintiff's office space, IOC has not resumed operations.  Its sole shareholder conducts business related to IOC in Old Lyme, Connecticut.  To the extent that there is a need for consistent interpretation of insurance policies covering business and other losses at the former World Trade Center, New York has the most significant relationship to the instant claim.  Therefore, the court applies New York law and grants PW's motion for summary judgment on IOC's claim of bad faith.

- 14 -

**V.      DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CUTPA CLAIM**

In Count VI of its complaint, IOC alleges violation of the Connecticut Unfair

Trade Practices Act (CUTPA) by PW.  Specifically, IOC alleges that PW violated

various provisions of the Connecticut Unfair Insurance Practices Act ("CUIPA") as well

as various common law prohibitions against bad faith and misrepresentation.  Because

the court finds that Connecticut law does not apply to the instant claims, it grants PW's

motion for summary judgment with respect to IOC's claim under CUTPA.

Furthermore, even if Connecticut law did apply, IOC could not make out a claim

under CUTPA.  "The definition of unacceptable insurer conduct in § 38-61 [CUIPA]

reflects the legislative determination that isolated instances of unfair insurance

settlement practices are not so violative of the public policy of this state as to warrant

statutory intervention.  Under CUTPA, as under CUIPA, a litigant is bound by this

legislative determination."  Mead v. Burns, 199 Conn. 651, 666 (1986).  "[A] CUTPA

claim based on an alleged unfair claim settlement practice prohibited by § 38a-816(6)

require[s] proof, as under CUIPA, that the unfair settlement practice had been

committed or performed by the defendant 'with such frequency as to indicate a general

business practice.'"  Lees v. Middlesex Insur. Co., 229 Conn. 842, 850 (1994).  IOC has

not put forward evidence to support a finding by a rational trier of fact that PW has

committed unfair settlement practices with sufficient frequency to indicate a general

business practice.  Lees cites with approval two cases in which courts concluded that

allegations that an insurer engaged in unfair settlement practices on multiple occasions

with respect to one claimant's claim or claims is insufficient to sustain a CUTPA claim

- 15 -

premised on CUIPA violations.  Id. at 850 n. 9 ("Our conclusion is in accord with that of the Appellate Court in Quimby v. Kimberly Clark Corp., 28 Conn.App. 660, 671-72, 613 A.2d 838 (1992), where the court held that the plaintiff's allegation of multiple unfair claim settlement practices by the defendant insurer in the handling of the plaintiff's workers' compensation claim, absent an allegation of unfair settlement practices by the insurer in the handling of other claims, failed to state a cause of action under CUIPA. See also Aguilar v. United National Ins. Co., 825 F.Supp. 456 (D. Conn. 1993) (allegation of several unfair claim settlement practices by insurer in connection with a single claim does not state a claim under CUIPA")).  Mead makes clear that, in order to support a CUTPA claim for unfair settlement practices based on violations of common law, IOC must come forth with evidence that PW's alleged common law violations constitute a general business practice as well.  Mead, 199 Conn. at 663-64.

## VI.    PREJUDGMENT REMEDIES

The Federal Rules permit this court to impose any "remed[y] providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action [that is] available under the circumstances and in the manner provided by the law of [Connecticut]."  Fed. R. Civ. P. 64.  Connecticut law allows a court to grant a motion for prejudgment remedy upon a showing by the movant that "there is probable cause to sustain the validity of the plaintiff's claim."  Conn. Gen. Stat. § 52-278d(a).  "Probable cause 'is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.' Essentially, the court must weigh the probabilities of success."  Amatulli v. People's

- 16 -

Bank, 965 F.Supp. 1, 2 (D. Conn. 1997).  The defendant's solvency or access to financial resources sufficient to meet its liability should the court finally conclude that it is liable is immaterial to a determination regarding pre-judgment remedies under Connecticut law.

The court would normally have to hold a hearing on the question of whether there is probable cause to sustain the validity of the plaintiff's claim.  Id.[5]  Nevertheless, the fact that the instant ruling grants plaintiff's motion for partial summary judgment establishes that there is probable cause to sustain the validity of at least some of the plaintiff's claims.  See Amatulli 965 F.Supp. at 2.  While the court is mindful of PW's argument that there is no reason to doubt its ability to meet its obligations, including any that may arise from liability to IOC, this argument is immaterial and irrelevant to IOC's claim for prejudgment remedy.

## VII.   DISCLOSURE OF ASSETS

"The court may, on motion of a party, order an appearing defendant to disclosure property in which he has an interest or debts owing to him sufficient to satisfy a prejudgment remedy."  Conn. Gen. Stat. § 52-278n(a).  The court cannot grant a motion to disclose property unless "the party filing the motion for disclosure has . . . probable cause sufficient for the issuance of a prejudgment remedy."  Because, as discussed supra, IOC has demonstrates probable cause sufficient for issuance of a prejudgment remedy, it is entitled to disclosure of property.

---

[5]  The plaintiff could establish an exception to the hearing requirement, as provided for in Conn. Gen. Stat. § 52-278e(a), but IOC does not rely on § 52-278e in making the instant motion.

**CONCLUSION**

For the foregoing reasons, the plaintiff's motion for partial summary judgment [Dkt. No. 10] is GRANTED in part and DENIED in part.  Defendant's motion for partial summary judgment [Dkt. No. 28] is GRANTED.  Plaintiff's motions for pre-judgment remedy [Dkt. No. 13] is GRANTED and for disclosure of assets [Dkt. No. 14] is GRANTED.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 14th day of September, 2005.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge